**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Alberto GESSA, Defendant–Appellant, Cross–Appellee.**

Nos. 90–5825, 90–5903.

United States Court of Appeals, Sixth Circuit.

Reargued Feb. 12, 1992.

Decided Aug. 7, 1992.

H.H. Hester, Asst. U.S. Atty. (briefed), Ernest W. Williams, U.S. Atty., Office of the U.S. Atty., Nashville, Tenn., Sean Connelly (argued and briefed), U.S. Dept. of Justice, Civil Div., Washington, D.C., for U.S.

Charles R. Ray (argued and briefed), Bryan & Marett, Nashville, Tenn., for Gessa.

Before: MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, MILBURN, GUY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, and BATCHELDER, Circuit Judges; and CONTIE and KRUPANSKY, Senior Circuit Judges.

CONTIE, Senior Circuit Judge.

Defendant-appellant, Alberto Gessa, appeals his conviction and sentence for conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and for distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The United States cross-appeals from the district court's alleged misapplication of the United States Sentencing Guidelines (U.S.S.G.).

I.

In February 1989, defendant, Alberto Gessa, was charged on two counts of a twenty-three count, nineteen-defendant indictment, alleging conspiracy to distribute and distribution of cocaine in the Middle District of Tennessee in or about the spring and summer of 1988. All of defendant's co-defendants either pled guilty or were tried and convicted in May and June of 1989 under a different prosecutor. Defendant was not tried at the same time because he had become a fugitive and was not apprehended until September 1989.

During defendant's trial in February 1990, it was established that his brother, Alex Gessa, was the ringleader in a drug trafficking ring that transported cocaine from Florida to Tennessee and that his main couriers included defendant, Sergio Alarcon, Manuel Perez, Louis Garcia, and Juan Perez. The bookkeeper of the drug organization was Camille Kohler, Alex Gessa's former girlfriend, who testified against all of the co-defendants on behalf of the government.

In her debriefing for the first trial, Camille Kohler had told the prosecutor that there existed a scheme to import 2500 kilograms of cocaine from Colombia by air dropping the cocaine in the ocean and picking it up by boat, but the prosecutor in the first trial did not believe there was sufficient evidence of a foreign importation scheme and did not introduce any evidence about it against defendant Gessa's co-defendants.

The prosecutor in defendant's trial decided to introduce evidence of a 2500 kilogram importation scheme against defendant because it found two witnesses, Jesus Fleitas and Eli Palmer, who agreed to testify that on two prior occasions, defendant had used a boat to import cocaine into Florida from Green Turtle Cay in the Grand Bahamas.

At defendant's trial, Camille Kohler testified that a 2500 kilogram importation scheme existed, but three other witnesses, Alex Gessa, Sergio Alarcon and Barbara

Alarcon, stated that the alleged scheme was a ruse developed to deceive Camille Kohler about the real reason her boyfriend, Alex Gessa, was in Florida, which was to see another girlfriend, Laurie Becak. Testimony from Kohler and others disclosed that during the time period between the late spring and November of 1988, the organization of Alex Gessa had obtained approximately 2.5 to 3 kilograms of cocaine from defendant for distribution in the Middle District of Tennessee. On February 13, 1990, defendant was convicted as charged on one substantive count and one conspiracy count.

A final sentencing hearing was held on June 11, 1990. The district court stated that it believed a 2500 kilogram foreign importation conspiracy had been established by a preponderance of the evidence. The court credited Camille Kohler's testimony over that of the other co-conspirators that there existed a definite scheme, which was not a ruse, to obtain 2500 kilograms of cocaine from Colombia by air drop and boat lift. The district court also credited Kohler's testimony that she had wired large amounts of money from Tennessee to Alex Gessa, defendant's brother, who was in Ft. Lauderdale, and had arranged for the transportation of Alex Gessa's boat from Nashville to Florida. The district court, on the other hand, indicated that the scheme was too vague and tenuous to use for sentencing purposes. The court also objected to sentences based merely on "conversational cocaine" when the transaction that was the object of the conspiracy had never been completed. The district court rejected the recommendation in defendant's pre-sentence report that his base offense level

include the 2500 kilogram amount, and instead sentenced defendant on the basis of 2.5 to 3 kilograms of cocaine.[1] The base offense level for 2.5 to 3 kilograms at the time defendant was sentenced was 28. The district court added two points for obstruction of justice, which coupled with a criminal history category of I, resulted in a sentencing range from 97 to 121 months of incarceration. Without explaining its reasons for doing so, the district court departed downward by one month from the applicable Guideline range and sentenced defendant to 96 months in prison to be followed by four years supervised release. The court also imposed a $55,000 fine and a $100 special assessment.

Defendant timely appealed his conviction and sentence. The United States cross-appealed from the district court's alleged misapplication of the United States Sentencing Guidelines.

This matter is now before this court in an en banc proceeding.

## II.

Defendant objected to the admission of the testimony of Camille Kohler and other co-defendants, arguing that their statements about what Alex Gessa had told them were narrative declarations and not in furtherance of the conspiracy.

 The district court overruled defendant's objections pursuant to Fed. R.Evid. 801(d)(2)(E).[2] Although it is often stated that we apply an abuse of discretion standard to a district court's evidentiary rulings,[3] we believe this statement sweeps too broadly in regard to Rule 801(d)(2)(E),

---

1. Under the Guidelines, the base offense level for drug offenses is determined by the type and quantity of drugs involved in the offense. U.S.S.G. § 2D1.1(a)(3). At the time defendant was sentenced, the highest base offense level applicable to his conduct, if the 2500 kilogram amount were included, was set at 36 for quantities of cocaine in excess of 30 kilograms. U.S.S.G. § 2D1.1(a)(3) (October 1987). The pre-sentence report calculated a base offense level of 36, added two points for obstruction of justice, which coupled with a criminal history category of I, yielded a sentencing range from 235 to 293 months of incarceration.

2. Fed.R.Evid. 801(d)(2)(E) states:

 (d) *Statements which are not hearsay.* A statement is not hearsay if—
 (2) *Admission by party-opponent.* The statement is offered against a party and is (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

3. *United States v. Blakeney,* 942 F.2d 1001, 1020 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992); *United States v. Hitow,* 889 F.2d 1573, 1581 (6th Cir.1989).

which requires that specific factual determinations and legal conclusions be made in order for the evidence to be admitted. In order to admit the statement of a co-conspirator under Fed.R.Evid. 801(d)(2)(E), it must first be determined that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made "in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). These are factual determinations governed by the clearly erroneous standard of review. *See Mahoney v. United States*, 831 F.2d 641, 645 (6th Cir.1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 922 (1988).

 In the present case, the district court's determinations that the government had proven the existence of a conspiracy by a preponderance of the evidence, that defendant was a member of the conspiracy, and that the statements, which Alex Gessa had made to others attributing 2.5 to 3 kilos to defendant, were made in "furtherance of the conspiracy" are not clearly erroneous. *United States v. Rios*, 842 F.2d 868, 874 (6th Cir.1988) (statements of a co-conspirator which identify another co-conspirator as the source of drugs involved in the conspiracy are in furtherance of the conspiracy), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). Based on these factual determinations, the district court concluded that Rule 801(d)(2)(E) permitted the "otherwise hearsay" co-conspirators' statements to be received as "not hearsay." This is a question of law, which we review de novo. *United States v. Blakeney*, 942 F.2d 1001, 1020 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991); *United States v. Levy*, 904 F.2d 1026, 1029 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991). In the present case, we find the district court

made the proper legal determination and admitted the co-conspirators' statements as not hearsay.

Defendant also objected to the admission of the testimony of witness Fleitas, who testified that he had accompanied defendant to Green Turtle Cay to obtain an unknown quantity of cocaine on two occasions prior to the inception of the 2500 kilogram conspiracy, and to the testimony of witness Palmer, who testified that he had accompanied defendant on one smuggling expedition to Green Turtle Cay to obtain 250 kilograms of cocaine. Defendant argued that the admission of this evidence violated Fed.R.Evid. 404(b) because it was unduly prejudicial evidence of prior bad acts.[4]

 The district court admitted the testimony under the exception to Fed.R.Evid. 404(b), which allows "[e]vidence of other crimes, wrongs, or acts" if it is probative of "intent, preparation, [or] plan." Although this court has frequently stated that we review 404(b) evidence under an abuse of discretion standard, *United States v. Loehr*, 966 F.2d 201 (6th Cir.1992); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2286, 119 L.Ed.2d 211 (1992); *United States v. Daniels*, 948 F.2d 1033, 1035 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1279, 117 L.Ed.2d 504 (1992); *United States v. Paulino*, 935 F.2d 739, 754 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991), we believe it is more precise to state the following. First, it must be determined as a matter of preliminary fact whether there is sufficient evidence that the prior act occurred. Second, a legal determination must be made whether the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan."

 In the present case, we do not believe that it was clearly erroneous for the district court to determine that the testimo-

---

**4.** Fed.R.Evid. 404(b) states in relevant part:
 (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ny of Palmer and Fleitas indicated that the prior acts, the excursions to Green Turtle Cay, had occurred. We believe the district court then made the correct legal determination that this evidence was probative of "intent, preparation, [or] plan," because the prior excursions were probative of defendant's ability and opportunity to participate in an importation scheme. *See United States v. Hitow*, 889 F.2d at 1579 (testimony about the defendant's prior drug deals was permissible to establish the background and development of the conspiracy).

■ Finally, in ruling on the admission of 404(b) evidence, the district court must determine whether the "other acts" evidence is more unfairly prejudicial than probative, which is governed by an abuse of discretion standard. *United States v. Blankenship*, 954 F.2d 1224, 1229 (6th Cir. 1992). In the present case, we find an abuse of discretion did not occur and affirm the district court's admission of the prior acts evidence.

Upon review of the record, briefs, arguments of the parties, and existing precedent, this court concludes that defendant's remaining assignments of error are equally without merit.

### III.

We will now address the issues the United States raises on cross-appeal. The United States argues that the district court erred by failing to include the 2500 kilograms of cocaine, which was the object of the alleged foreign importation conspiracy, in calculating defendant's base offense level. The government contends that once the district court stated that the plan to smuggle 2500 kilograms of cocaine from Colombia by air drop and boat had been established by a preponderance of the evidence, the district court was required to include that amount in defendant's base offense level pursuant to the dictates of U.S.S.G. § 2D1.4. Guideline § 2D1.4 states that if a defendant is convicted of participating in an incomplete conspiracy, the "offense level *shall* be the same as if the object of the conspiracy ... had been completed" (emphasis added). The United States contends

that because the language of Guideline § 2D1.4 is mandatory, not precatory, the entire quantity of cocaine that defendant unsuccessfully conspired to possess *must* be used to establish his base offense level and the 2500 kilogram amount was erroneously excluded.

Generally, a district court must apply the Guidelines in effect "at the time of sentencing" under 18 U.S.C. § 3553(a)(4). *United States v. Nagi*, 947 F.2d 211, 213 n. 1 (6th Cir.1992). Defendant was sentenced on June 11, 1990. The relevant Guideline in effect on this date (Guideline § 2D1.4, *Attempts and Conspiracies*) states:

(a) Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

U.S.S.G. § 2D1.4 (Nov. 1, 1989). However, Application Note One to Guideline § 2D1.4 provides an exception to the general rule. *United States v. Caba*, 955 F.2d 182 (2nd Cir.1992). Application Note One first states:

If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, each conspiracy transaction shall be included with those of the substantive counts of conviction to determine scale. If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount.

On the other hand, the Note further provides in relevant part:

However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G. § 2D1.4, Application Note One (Nov. 1, 1989).

■■■■ Contrary to the government's contention, a sentencing court is not automatically required to include the weight of an uncompleted transaction in the base offense level, but under Application Note One is required to make findings with respect to the defendant's intent and ability to produce the negotiated amount. *United States v. Jacobo*, 934 F.2d 411, 416 (2nd Cir.1991) ("It is clear ... that § 2D1.4 contemplates that the court itself is to make findings as to whether the defendant intended to produce the negotiated amount and was reasonably capable of producing that amount.") For offenses involving negotiation to traffic in a controlled substance, Application Note One requires the sentencing court to exclude from Guideline calculation the amount of drugs that it finds the defendant did not intend to produce and was not reasonably capable of producing.[5]

In the present case, although the district court did not make specific findings pursuant to Application Note One of § 2D1.4, it made numerous statements about why the 2500 kilogram amount was being excluded. On several occasions, the court indicated that although it believed there had been conversations and some planning for a 2500 kilogram importation scheme, the scheme was too tenuous and remote to be taken into account for sentencing purposes. During the sentencing hearing, the probation officer who had prepared the pre-sentence report was asked about defendant's alleged participation in the 2500 kilogram scheme. "Do you have any reference in any of those investigative notes or from any source of anything Alberto Gessa did or said to connect him with this twenty-five hundred kilo

scheme." Trial Transcript, Vol. V, p. 116. The probation officer answered, "No sir." *Id.* at 117. He was then asked if there was anything from the DEA investigative file or debriefing or any testimony of any witness other than Camille Kohler's statement that Alex Gessa had told her that such a scheme existed that Alberto Gessa did anything in furtherance of the alleged 2500 kilogram scheme. The probation officer indicated that the hearsay statement of Camille Kohler was his only source of information. *Id.* The probation officer was then asked whether the investigation was able to glean any independent knowledge that defendant even knew that allegedly there was a 2500 kilo scheme involving him. *Id.* at 122. He responded that it was not known whether defendant even knew what his brother was saying about him. The district court then stated:

> I've got some real reservations about punishing people for these amounts of contraband that are only the subject of conversation. They are like appritions [sic], they never appear.... The question is, what is [defendant] to be chargeable with as far as evidentiary basis to tie him to this twenty-five hundred kilogram importation business? ... what is there solid in this record, [for] an amount he's really chargeable with.

Appendix, p. 358–61. The court indicated that although it believed defendant had agreed to participate in the scheme based on Camille Kohler's statement, it was reluctant to include the 2500 kilogram amount on the basis of conversations, "until the conversations get a lot closer," Appendix, p. 362, or until the conversations had ripened into "something more solid." Appendix, p. 369.

---

**5.** Application Note One of § 2D1.4 became effective Nov. 1, 1989. U.S.S.G., App. C, p. C81–82 (Nov. 1, 1989). Under the former application note, unlike the current one, the sentencing court was not *required* to exclude such quantities of drugs in calculating the base offense level. *United States v. Alston*, 895 F.2d 1362, 1370 n. 8 (11th Cir.1990). Previously, the application note stated, "Where the defendant was not reasonably capable of producing the negotiated amount, the court *may* depart and impose

a sentence lower than the sentence that would otherwise result." U.S.S.G. § 2D1.4 (January 15, 1988) (emphasis added). The Federal Register (54 Fed.Reg. 21, 362 (May 17, 1989)) explains that as amended, Application Note One of § 2D1.4 mandates exclusion of amounts which a defendant was not capable of producing because "puffing" during the course of negotiations could result in inflated offense levels. *United States v. Vazzano*, 906 F.2d 879, 884 (2nd Cir.1990).

At other times, the court indicated that it was excluding the 2500 kilogram amount because there had been no completed transaction and it objected to sentencing a defendant on the basis of "conversational cocaine." The court indicated that in another case it had excluded a kilogram for the following reason:

[Although] there was plenty of tape conversation about a kilogram, [there was] ... never any [cocaine] actually seized, no firm transaction.

Appendix, p. 359. The court also stated that it had "real problems about punishing people for conversations about drugs," Appendix, pp. 360, 375, and indicated it was excluding the 2500 kilogram amount because "it is essentially cocaine in its conversation state." Appendix, p. 364.

The court's concluding statement was as follows:

In this case, the Court finds that the defendant has been convicted on Counts One and Eleven. Count One is the drug conspiracy count under 21 USC 846, and Count Eleven is the substantive count under 21 USC 841(B)(1)(A). As the Court has stated earlier in these proceedings, it is satisfied that the conspiracy count was properly submitted to the jury, including the proof related to this twenty-five hundred kilogram importation scheme. And it has previously stated its findings that the testimony of Camille Kohler is credited with regard to the involvement of Alex Gessa, the head of this drug ring, as well as the defendant, Mr. Alberto Gessa, who is Mr. Alex Gessa's brother. The proof also establishes that there was at least two and half to three, or slightly more, kilograms of cocaine obtained directly from the defendant, Alberto Gessa, and brought by couriers to the Middle District of Tennessee from southern Florida.

The Court has made it abundantly clear in the comments during the course of passing on objections of the defendant to various portions of the pre-sentence report that, while it credits the testimony of Camille Kohler with regard to this portion of this conspiracy that relates to

the importation scheme of this twenty-five hundred kilograms, and the Court is genuinely convinced and satisfied that there was such a scheme and subject of the conspiracy; and that she wired those funds to southern Florida; and a boat owned by Mr. Alexander Gessa was moved from the Middle District of Tennessee to the Southern District of Florida; that, nevertheless, it is what the Court has at length stated to be conversational cocaine, very much like some other conspiracies where the proof of what is actually purchased and the deals that have gone down involved relatively minute amounts of cocaine, these quarter-ounce sales, half-ounce sales, that we frequently see in these state-made cases that are brought over here to the United States Attorney's Office, or at least have been in the past.

After a number of those deals they start to have some conversation about maybe a kilogram, two kilogram quantities. And it's all sort of vague, no money ever passes hands, no precise details as to when the deal would be put together and consummated. The case is tried on 846 conspiracy and substantive counts related to the quarter-ounce, half-ounce, one ounce transactions. Then at sentencing, we're asked to impose sentence based on the kilogram, two kilograms that was the subject of conversation of the tape. That's what I mean by conversational cocaine.

Now, it's one thing to have the proof for purposes of conspiracy and to obtain conviction, submit it to the jury, and even another thing for the Court to credit it, and I have credited it. As I said, I believe it by a preponderance of the evidence here at the sentencing proceedings. But I simply do not believe that that alone, with nothing more, is sufficient to impose what would be in this case a draconian sentence.

. . . .

What we have here is proof of some two and a half to three or three and a half kilograms of cocaine brought up here from South Florida to the Middle District of Tennessee that this man has been

directly, concretely connected with. And I simply find that the rest of this is what I have repeatedly called this afternoon as conversational cocaine.

It's one thing to put it in the record, place his role in bringing out whatever the value the jury attaches to it, resulting in conviction on a Section 846 drug conspiracy count. And then it's—as a matter of fact, while I thought a large part of all this proceeding this afternoon and on two prior occasions with these objections was very much like we are seeing more, more and more in all of these sentencing proceedings, sort of a mini-trial, we finally at the last got down to the crux of the case, and that is what can this man actually be chargeable with for purposes of the imposition of sentence.

And I find that it's two and a half, three, three and a half kilograms of cocaine which, under the computations of the guidelines in effect at the time, results in an offense level of twenty-eight, and allowing for two level increase for obstruction of justice about which there is no controversy or objection to that portion, Paragraph 22 of the pre-sentence report, withdrawn, results in a total offense level of thirty with a Criminal History Computation of Category I, resulting in a guideline range of ninety-seven to a hundred and twenty months, and a fine range of $15,000 to $150,000 and a period of supervised release of at least five years on Count One and at least four years on Count Eleven.

Appendix, pp. 390–92, 395–96.

■ We find the district court's statements about the 2500 kilogram amount to be confusing and in need of further clarification. Was the court excluding the 2500 kilogram amount because it believed there was insufficient evidence besides conversations to link defendant to the scheme or to indicate that he was reasonably capable of producing that specific *quantity* of cocaine? Or was the court excluding the 2500 kilogram amount merely because the deal had never come to fruition and the court objected to the inclusion of "conversational cocaine" as long as the transaction was incomplete? We believe it would be improper for this court to give weight to some of the district court's statements and ignore others in an attempt to make a determination based on the record as it now stands. Instead, we believe the case must be remanded to the district court to allow it to resolve the inconsistencies in its statements.

■ According to the dictates of Guideline § 2D1.4, the district court must include the "conversational cocaine" involved in the 2500 kilogram conspiracy even though the object of that conspiracy was uncompleted, if it concludes that defendant had the intention to produce or was reasonably capable of producing 2500 kilograms by way of air drop and boat lift.[6] On the other hand, under Application Note One, the district court is required to exclude the 2500 kilogram amount if it finds that defendant did not have the intention and was not reasonably capable of producing that specific amount. Accordingly, we vacate the sentence and remand to the district court to make specific findings in this regard pursuant to Application Note One of Guideline § 2D1.4.[7] *United States v.*

---

**6.** The court must also take into consideration the foreseeability of an importation scheme that would involve a 2500 kilogram amount. Application Note One of Guideline § 1B1.3, *Relevant Conduct,* states in relevant part:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would otherwise be accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

**7.** The dissenting opinions urge that a remand is not necessary as defendant obviously had the intent and capacity to participate in a 2500 kilogram importation conspiracy. We believe that some of the factual data in Judge Krupansky's dissent is not supported by the record. Witnesses Fleitas and Palmer *did not testify* as stated in the dissent that they assisted defendant in the pick up of cocaine from the open seas or that defendant financed the pick up of bulk cargo from the ocean. They also said nothing about Colombian cartel cocaine connections. Fleitas testified that he twice accompanied defendant to Green Turtle Cay to pick up what he

*Brown,* 946 F.2d 58, 60 (8th Cir.1991) (sentence reversed and case remanded because district court failed to make findings with respect to the defendant's intent and ability to produce the negotiated quantity); *United States v. Richardson,* 939 F.2d 135, 143 (4th Cir.) (nothing in record to indicate how defendant could have raised enough money to purchase any cocaine; without the money, the defendant was not "reasonably capable of producing any cocaine"), *cert. denied,* —— U.S. ——, 112 S.Ct. 599, 116 L.Ed.2d 623 (1991); *United States v. Ruiz,* 932 F.2d 1174, 1184 (7th Cir.) (not a case in which the defendant had "actually arranged the details of a drug sale (e.g., price, quantity, location)" for ten kilograms so the comment of one conspirator about ten kilograms was "not sufficient to establish that the conspiracy had as its goal the consummation of a deal for upwards of ten kilograms"), *cert. denied,* —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991); *United States v. Monroe,* 943 F.2d 1007, 1019 (9th Cir.1991) (since marijuana was "in place" and had been funded, the district court properly determined the conspirators were "reasonably capable" of delivering six tons of marijuana); *United States v. Foley,*

estimated to be about 300 kilograms of cocaine for which he was paid $32,000. Appendix, pp. 257–61. Palmer testified that he was along on one of these expeditions, that he believed 250 kilos was imported, and that he was paid $10,000 for his assistance. Appendix, pp. 273–76. Jesus Fleitas testified that the procedure followed on both trips was that the boat left a dock in South Florida and went to Green Turtle Cay off of the Grand Bahama Islands. In a secluded bay at night, the cocaine was off-loaded from a smaller vessel onto their vessel, which then returned to Florida. Trial Transcript, Vol. II, pp. 284–89. Both Fleitas and Palmer testified that they did not know how this cocaine reached Green Turtle Cay and they did not know who financed the expeditions. Appendix, pp. 258, 275. Contrary to the dissent's assertion, Fleitas and Palmer stated that they *knew nothing* about a conspiracy between defendant and Alex Gessa. Appendix, pp. 255, 273. Thus, the record indicates that defendant allegedly previously imported 300 plus kilograms of cocaine by boat from Green Turtle Cay. There is no evidence whether defendant was working for someone else on these alleged trips to Green Turtle Cay or organized the expeditions himself.

A statement in the presentence report alleging that defendant had engaged at sea with Jay Fleitas with a Colombian cartel is uncorroborated and defendant objected to its inclusion in the presentence report. The district court sustained the objection. Since at trial neither Fleitas nor any other witness testified about previously engaging with a Colombian cartel at sea, there is no support in the record to substantiate this statement, and it must be disregarded unless the government can establish its truth by a preponderance of the evidence. This court has held that a preponderance of the evidence standard applies to contested facts in sentencing proceedings. *United States v. Mandell,* 905 F.2d 970, 974 (6th Cir.1990). *See also United States v. Stanberry,* 963 F.2d 1323, 1326 (10th Cir.1992) (when factors important to the sentencing determinations are reasonably in dispute, the sentencing court must resolve these issues in accordance with the preponderance of the evidence standard); *United States v. Granados,* 962 F.2d 767, 771 (8th Cir.1992) (presentence report is not evidence and is not a legally sufficient basis for making findings on contested issues of material fact).

Also Sergio Alarcon's testimony, which the dissent quotes only in part, did not corroborate Kohler's testimony of a conspiracy to smuggle 2500 kilograms of cocaine. He testified that he was told by Alex Gessa to call Kohler and pretend that he was in Florida to participate in practice boat drills that had to be cancelled due to bad weather when in truth he was not in Florida and no such drills had been attempted. Appendix, pp. 173–75. Alarcon's testimony thus supports the defendant's contention that the alleged 2500 kilogram conspiracy was a ruse to deceive Kohler and enable Alex Gessa to party with Laurie Becak in Florida. Barbara Alarcon testified that although she'd been told that there was a 2500 kilogram conspiracy, she later was told that all the money Camille Kohler had wired to Alex Gessa in Florida was not used to set up the 2500 kilogram deal, but was used by him to party with Laurie Becak. Appendix, p. 208. Contrary to the dissent's assertion, there are no statements of Howard Becak in the record about a 2500 kilogram conspiracy or about prior trips to Green Turtle Cay.

The only person who stated that she still believed in the actual existence of a 2500 kilogram conspiracy to obtain cocaine by air drop and boat lift which involved defendant was Camille Kohler and her knowledge of defendant's alleged participation was based on hearsay. We believe that based on these facts, a question remains whether it has been established by a preponderance of the evidence that defendant had the intention and capacity to participate in a 2500 kilogram conspiracy to import cocaine by air drop and boat lift or whether the scheme or defendant's alleged participation in the scheme was too remote and tenuous to be used for sentencing purposes. The district court raised this issue at the sentencing hearing and we believe the court should be given an opportunity to resolve it on remand.

906 F.2d 1261, 1264–65 (8th Cir.1990) (a single conversation about two ounces of cocaine does not support the charge that a negotiation for two ounces had occurred that could be used to establish the defendant's base offense level under Guideline § 2D1.4); *United States v. Rodriguez*, 896 F.2d 1031, 1033 (6th Cir.1990) (sufficient support for district court's finding that appellant was capable of delivering 60 kilograms of marijuana because appellant was recorded telling the government informant that he could produce "100 a week" and co-conspirators corroborated this statement); *United States v. Bradley*, 917 F.2d 601, 605 (1st Cir.1990) (because "the district court made specific findings, articulating its reasons for believing that [defendant] both intended, and had the capacity, to deliver the kilogram," the inclusion of the kilogram that never surfaced in a completed transaction was proper).

## IV.

 The United States also argues on cross-appeal that the district court erroneously made a downward departure from the applicable Guideline range in order to equalize defendant's sentence with that of his co-conspirators. Because evidence of the 2500 kilogram importation scheme had not been brought against defendant's co-conspirators, the co-conspirators, who, like defendant, had acted as major couriers for ringleader Alex Gessa, had received sentences ranging from 41 to 97 months. The United States contends that rather than impose a "draconean" sentence based on the 2500 kilogram amount on defendant in comparison with the sentences of his co-conspirators, the district court departed downward from the applicable Guideline range of 235–293 months in order to equal-

ize his sentence with that of his co-conspirators.

We disagree with the United States that in its present posture, this case involves a downward departure from a sentencing range of 235–293 months. Although the district court indicated that if the 2500 kilogram amount were included in defendant's base offense level, it would create an inequitable disparity in sentences, the court did not include that amount and then depart downward. Instead, the district court decided not to include the 2500 kilogram amount in calculating defendant's base offense level. The district court specifically stated, "[W]e finally ... [have] got down to the crux of the case, and that is what can this man actually be chargeable with for purposes of the imposition of sentence. And I find that it's two and a half, three, three and a half kilograms of cocaine, which under the computations of the guidelines in effect at the time, results in an offense level of twenty-eight." Appendix, p. 395.

Because the district court did not include the 2500 kilogram amount in calculating defendant's base offense level, it was not necessary to depart downward from 235 to 293 months in order to equalize his sentence with that of his co-conspirators. Therefore, at this time, we decline to review whether a downward departure for such a reason would be appropriate.[8] If, on remand, the district court believes that it is required to include the 2500 kilogram amount in calculating defendant's base offense level, it may determine whether a downward departure to equalize sentences is permissible in light of this court's prior statements in *United States v. Nelson*, 918 F.2d 1268 (6th Cir.1990) and *United States v. Parker*, 912 F.2d 156 (6th Cir.1990).[9]

---

**8.** The district court did make a one month downward departure from the Guideline sentencing range of 97 to 121 months based on 2.5 to 3 kilograms of cocaine as the drug amount. However, this departure is not material to this issue. It should be noted that on remand if the district court wishes to depart from the applicable Guideline range, the court must state the reasons for this departure pursuant to 18 U.S.C. § 3553(c). *United States v. Kennedy*, 893 F.2d 825, 829 (6th Cir.1990).

**9.** The dissents suggest that it is a waste of judicial resources for this court not to decide this issue. However, any statement made by this panel in this regard would be an advisory opinion and mere dicta. Because the district court did not make a downward departure to equalize sentences, this issue is not yet ripe for review.

Although we decline to address this issue, we believe it must be pointed out that there is no support in the record that defendant was the *more culpable participant* in the alleged 2500

## V.

To conclude, the conviction of defendant for violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 is hereby AFFIRMED. Defendant's sentence is VACATED and this case is REMANDED to the district court for proceedings consistent with this opinion.

KRUPANSKY, Circuit Judge, concurring in part, dissenting in part.

Defendant Alberto Gessa (Gessa) appealed his conviction and sentence on one conspiracy and one substantive count of cocaine distribution. The United States cross-appealed from the district court's alleged misapplication of the sentencing guidelines. I would concur in the majority's disposition of the Defendant, Alberto Gessa's, assignments of error. I do, however, respectfully dissent from the majority's resolution of error assigned by the government in its cross-appeal.

Gessa had been named along with 18 co-defendants in a 23-count indictment returned on February 28, 1989. Gessa was charged in count 1 with conspiring "from and in and about the summer of 1987" to the date of the indictment with all co-defendants to distribute cocaine and other substances in violation of 21 U.S.C. § 846. Count 11, the only other count in which Gessa was named, charged him and six others with the substantive offense of distributing unspecified quantities of cocaine in the Middle District of Tennessee "[i]n or about the spring and summer of 1988" in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Following defendant Gessa's conviction by a jury on both counts, the district court on June 13, 1990, sentenced him to serve 96 months in prison. The sentence resulted from a one-month downward departure from a selected guideline range of 97–121 months. The government cross-appealed, charging that, in predicating the sentence upon only 2.5 to 3 kilograms of cocaine, the district court had improperly ignored its own finding that Gessa had conspired to import and distribute 2,500 kilograms of cocaine.

A comprehensive and orderly expose of the facts developed during trial will more graphically demonstrate the misconceptions of the majority's decision.

When Gessa became aware of the government's intention to insist upon his pretrial detention, he fled the jurisdiction and remained a fugitive for nine months. By the time he was finally apprehended on September 20, 1989, all of his co-defendants had either been tried and convicted or had pleaded guilty to the substantive and conspiracy charges against them. As a result of his fugitive status, Gessa was the last of the co-indictees to face trial.

The government's evidence at Gessa's trial to support the conspiracy count disclosed a well-developed and partially implemented plan which had been devised by the brothers Gessa to obtain and illegally enter into the continental United States, in an undisclosed number of shipments, roughly 2,500 kilograms of cocaine for distribution within the various geographical areas of the country. Thirty-eight kilos of the illegally entered cocaine were destined for distribution and sale in Tennessee. The cocaine was to be "imported in like five hundred kilogram lots, going to be flown from Colombia, South America. It was to be flown to the Bahamas, and that boats

kilogram conspiracy as Judge Krupansky's dissent alleges. Camille Kohler testified that defendant's brother, Alex Gessa, was the one who had experience in bringing in drugs from the ocean. Also the record does not support the dissent's statement that defendant was the *"ever present volume pipe-line of cocaine that supplied well-organized distributors such as his brother."* This statement is contrary to what the United States argued in regard to defendant. In its closing argument, the prosecution stated that defendant was *not* one of the primary suppliers in his brother's distribution ring, and that the

United States was *"not arguing for an instant that he was the lead, primary supplier of cocaine in this case."* Appendix, p. 319. The record indicates, instead, that defendant supplied 2.5 to 3 kilograms of cocaine to his brother, Alex, who was the ringleader of a cocaine distribution ring between Florida and Tennessee, which operated 30 or more mules, one of whom was defendant. The district court refused to allow testimony about defendant's prior alleged cocaine-trafficking activities into the trial except as they related to his ability to participate in an importation conspiracy.

were to be used" for ferrying the cocaine to the United States. Sentencing Tr. at 7 (Testimony of Probation Officer Richard Leonard Montaya).

In support of the separate substantive count charged in count 11 of the indictment, the government charged that the defendant Gessa had, during the late spring and summer of 1988, aided and abetted in transporting between 2.5 to 3 kilograms of cocaine to the Middle District of Tennessee where he distributed and sold and/or aided and abetted in the sale and distribution of that cocaine.

Testimony from Camille Kohler (Kohler) and other co-defendants to support count 11 of the indictment, namely the distribution and sale of 2.5 to 3 kilograms of cocaine, disclosed that the organization had, during the period from late spring 1988 until Thanksgiving of that year, transshipped 2.5 to 3 kilograms of illegally entered Florida cocaine for distribution and sale within the Middle District of Tennessee.

To satisfy its burden to prove the conspiracy charged in count 1 of the indictment, the government relied heavily upon the testimony of Kohler, the "bookkeeper" for the cocaine distribution ring headed by Gessa's brother, Alexander Gessa (Alex Gessa), and staffed in various capacities by the remaining co-indictees including Jesus Fleitas (Fleitas), Eli Palmer (Palmer), and Howard Becak (Becak). The brothers Gessa operated a well-organized, efficient, financially well-funded, mobile, logistically well-supported, wide ranging enterprise with alleged direct Colombian drug connections, a network of mules, wholesale and retail distributors, strategically situated in various geographical areas.[1]

Over objection, the court permitted testimony that Gessa and his brother had, prior to their indictment, planned to import approximately 2,500 kilograms of cocaine from Colombia. According to Kohler, the Gessa brothers planned boat lifts of 2,500 kilograms of Colombian cocaine that was "supposed to be air-dropped into the ocean and picked up by the large boat and brought into the smaller boats and brought in further to shore." Trial Tr. Vol. I at 48. She also explained how the brothers were going "to bring in 2,500 kilos of cocaine the

---

1. The indictment in the instant action has charged the defendant Alberto Gessa with a Title 21 U.S.C. Section 841(a)(1) conspiracy pursuant to Title 21 U.S.C. Section 846 that commenced "from in and about the summer of 1987 to the date of the indictment" on February 28, 1989. It appears that the initial target of the government's investigation was Alexander Gessa, Alberto's brother, who was the kingpin of a sophisticated cocaine ring in and about Ashland City, a suburb of Nashville, in the Middle District of Tennessee.

The record disclosed that prior to approximately the spring of 1988 the Gessa brothers directed two separate cocaine enterprises that operated independently of each other because of their inability to get along. Alexander Gessa's Tennessee operation was basically a distribution organization that embraced thirty or more people. Alex Gessa would purchase bulk cocaine in lots of 3 or more kilograms in Miami or Fort Lauderdale, Florida, and transport it to Ashland City, Tennessee where it was cut, repackaged and fronted or sold to wholesale or street people for distribution and sale. The defendant Alberto Gessa was enmeshed in the investigation of Alexander, as it progressed. Consequently, the defendant initially maintained a lower profile during the governments pursuit of the Alexander Gessa organization.

The record disclosed that Alberto Gessa, who lived in Plantation, Florida, a suburb of Fort Lauderdale, was the more sophisticated, more insidious and more culpable of the brothers. He was the one who had the Colombian cocaine connection, the one who was the experienced charter boat captain—"Judge, my client is an experienced sea captain," the one who was an experienced ocean navigator familiar with Bahamian waters, the one who was capable of plotting and successfully coordinating ocean rendezvous and retrievals of bulk cocaine cargos of 250 kilograms or more (over 550 pounds), and the one who had the entree to the "boat people" and boats; all essential attributes to smuggling mega cargos of cocaine into the United States for repackaging and distribution.

Although Alex had made sporadic purchases of cocaine from his brother prior to the spring of 1988, because of the differences that existed between them, Alex relied upon other Florida bulk suppliers for his source cocaine. During the spring of 1988 when Alex's other Florida sources of supply had dried up, he turned to his brother Alberto. It was as a result of this family reunion that the brothers entered into a joint venture to pool their financial and personnel resources which joint venture became the basis for the conspiracy charges against the defendant, Alberto, his brother and others to import 2,500 kilos of cocaine.

same way his brother [defendant Alberto] had brought back cocaine back in July" from Green Turtle Cay. *Id.* at 46. Sergio Alarcon (Alarcon) testified to discussions with co-conspirator Alex Gessa concerning a plan to import a large amount of cocaine into the United States through Florida with the defendant Alberto and how Kohler stated "they were going to make a lot of money, and we're going to retire." Trial Tr. Vol. II at 51–52. Kohler, Fleitas, Palmer, and Becak related how the Gessa brothers had conspired to ferry drugs to the United States mainland for distribution and sale. Thirty-eight kilos were earmarked for transshipment to the Middle District of Tennessee for distribution and sale by the Alexander Gessa operation. Kohler testified that, in furtherance of this scheme, she wired large amounts of cash on at least twenty or more occasions from Tennessee to Alex Gessa in Fort Lauderdale, and had, in addition, arranged for the transportation of Alex Gessa's boat from Nashville to Florida to assist in the boat lifts. Kohler also disclosed that the brothers engaged in what she characterized as "practice runs" in preparation for the boat-lifts. Witnesses Fleitas and Palmer testified that on two occasions in May or June and August of 1988 they had accompanied Alberto Gessa to Green Turtle Cay to conduct similar operations.

Gessa objected to the admission of this testimony, arguing that it was hearsay information initially conveyed to the witnesses by non-testifying declarants. Concluding that the government had proven the existence of a conspiracy by a preponderance of the evidence and that Alex Gessa's statements attributing the drugs to defendant were made in "furtherance" of that conspiracy, the district court overruled Gessa's objection pursuant to Fed.R.Evid.

801(d)(2)(E) and an accompanying *Vinson–Enright* ruling.[2]

In an effort to justify the money transfers and the shipment of his boat to Fort Lauderdale, Alex Gessa, who testified on behalf of the defendant, explained that he needed both the money and the boat to pursue an on-going, expensive romantic relationship with one Laurie Becak, and that—in a ruse designed to mislead Kohler, with whom he was also romantically involved—he had feigned interest in importing cocaine.

Defendant Gessa charged that the district court erred when it permitted witnesses Fleitas and Palmer to testify that they had accompanied Gessa to Green Turtle Cay to make ocean pick-ups of bulk cocaine on two occasions during May or June and August of 1988. Gessa objected to the introduction of this evidence under Fed. R.Evid. 404(b), arguing that Fleitas's testimony was unduly prejudicial evidence of prior bad acts. The district court, however, admitted the testimony, concluding that the evidence was probative of "preparation" or a "plan" to import and distribute 2,500 kilograms of cocaine.[3]

Gessa asserted on appeal that, subsequent to his conviction, the government erroneously advanced the 2,500 kilograms of cocaine as a predicate quantity for sentencing purposes. The probation officer who prepared the presentence investigation report recommended to the district court that this greater quantity be assessed as "relevant conduct" under the guidelines. Pursuant to this observation, the probation officer calculated a base offense level of 36 because the quantity of the cocaine implicated in the conspiracy exceeded 50 kilograms[4] and added two points for Gessa's

---

**2.** See *United States v. Vinson,* 606 F.2d 149 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. Enright,* 579 F.2d 980 (6th Cir.1978).

**3.** Kohler's testimony concerning the importation plan was separately admitted pursuant to the trial court's aforementioned *Vinson–Enright* ruling.

**4.** Narcotics sentences under the guidelines are calibrated to the quantity of substance implicat-

ed in the offense(s) of conviction. The guidelines currently do not make separate sentencing provision for quantities of cocaine in excess of 1,500 kilograms. Under the version of the guidelines presently in effect, quantities in excess of 1,500 kilos earn a base offense level of 42, which corresponds to a sentencing range of at least 360 months to life imprisonment. U.S.S.G. § 2D1.1(c)(1) (Nov. 1, 1990). *At the time of Gessa's offense, the highest base offense level applicable to his conduct was set at 36 for*

obstructive behavior in failing to surrender to the authorities upon his indictment. Coupled with a criminal history category of I, this yielded a sentencing range of from 235 to 293 months of incarceration.

Subsequent to a series of sentencing hearings, the district court concluded as a matter of fact that Gessa and his brother had conspired to import 2,500 kilograms of cocaine via the Bahamas. "The court is genuinely convinced and satisfied that there was such a scheme and subject of the conspiracy." In reaching this conclusion, the court expressly credited the testimony of Kohler and other corroborating witnesses over that of Alex Gessa:

THE COURT: I don't have any doubt about the fact conspiracy proven [sic] here beyond a reasonable doubt that Alberto Gessa was a party to with the Alexander Gessa organization and the ferrying up the supplying of cocaine that was ferryed up through the couriers to Ashland City. I believe he's overwhelmingly connected with that. I've credited that proof, as we've gone through these objections. I also credited the proof of Camille Kohler on this importation business and the scheme of the twenty-five hundred kilo importation. I think she's telling the truth, as opposed to Alexander Gessa business that it was a ruse to keep her from knowing he was carousing around in South Florida with Laurie Becak, and that his brother wasn't a party to it.

As I said before, I wouldn't believe Alexander Gessa unless he's independently supported by other good, clear, convincing witnesses. So I don't have any trouble finding that he would be more than willing to lie, and I think he has lied right here within three feet of me, of saying, oh, his brother has no connection with it, and I'm down there carousing with Laurie Becak. I didn't want Camille Kohler to know about it, so all this was an elaborate ruse, telling her to send me money by Western Union. I think that's

a plain lie. I don't believe it. I credit Camille Kohler's version....

Exc. from Sent. at 27.

The district court, however, was not disposed to sentence Gessa accordingly. The court opined that it would have been "something else" for sentencing purposes if the Gessa brothers had actually "got that twenty-five hundred kilograms to shore...." The court remarked that the mere finding by a preponderance of the evidence that the scheme existed did not warrant imposition of such a "draconian sentence" for what the court termed "conversational cocaine."

The court advanced another seemingly independent reason for its refusal to sentence Gessa according to the volume of cocaine implicated in the conspiracy. The court noted that all of Gessa's co-indictees had already been convicted and sentenced, and none, apart from Alex Gessa, had received a sentence longer than 97 months of incarceration, with most of the lower-level conspirators receiving sentences ranging from 10 to 60 months because their respective participations involved comparatively small quantities of cocaine. It is important to note, though, that the chief of the Tennessee distribution operation, Alex Gessa, received a sentence of 30 years pursuant to his plea of guilty to count 22 of the indictment which charged him with leading a continuing criminal enterprise in violation of 21 U.S.C. § 848. (Neither Alberto Gessa, the defendant herein, nor any other co-defendant apart from Alex Gessa was charged under this "kingpin" statute.) Alex Gessa's sentence reflected the statutory mandatory minimum for the offense of conviction, *see* 21 U.S.C. § 848, and therefore, was not premised in any way upon the quantity of cocaine implicated in his conduct.

As previously indicated, the reasons for Gessa's sentencing dilemma are apparent in the record. The prosecutions of the first 17 co-defendants had been conducted by an Assistant United States Attorney (A.U.S.A.) who had resigned from the United States Attorney's office prior to defen-

*quantities of cocaine in excess of 50 kilograms.* U.S.S.G. § 2D1.1(c)(1) (Nov. 1, 1987).

dant Gessa's capture. At the evidentiary sentencing hearing, the initial A.U.S.A. testified that, upon an evaluation of the evidence available to him at the time Gessa's co-defendants were scheduled for trial, and because he was confronted with only the uncorroborated testimony of Kohler to prove the conspiracy to import 2,500 kilos of cocaine into the United States, he was of the considered opinion that the proof would not support a finding that the brothers Gessa intended to import 2,500 kilograms of cocaine. However, the successor A.U.S.A., to whom defendant Gessa's case was subsequently assigned for prosecution, had the advantage of nine extra months during which to prepare a case against him. During that extended period, the A.U.S.A. developed, in addition to the Kohler testimony, corroborating testimony from Fleitas, Palmer, Becak and others, of sufficient weight to warrant a prosecution of defendant for conspiring to import, possess and distribute 2,500 kilograms of cocaine. During defendant's fugitive status, co-defendants Fleitas, Palmer and Becak came forward to corroborate Kohler's disclosure of the conspiracy to smuggle 2,500 kilos of cocaine into the United States for distribution and sale. The legal significance of this additional evidence developed during defendant's fugitive status was to permit the government to present a far more aggravated conspiracy than it was initially capable of proving when defendant Gessa's co-conspirators pleaded guilty to or were convicted of the conspiracy involving 2.5 to 3 kilograms of cocaine.

Although the trial court credited Kohler's testimony and the testimony of Fleitas, Palmer and Becak and concluded that Gessa conspired to import, possess and distribute 2,500 kilograms of cocaine, it nevertheless rejected the probation officer's recommendation that defendant be sentenced accordingly. Instead, the trial court decided to equalize Gessa's sentence with those of his co-defendants by selecting 2.5 to 3

kilograms of cocaine as the relevant conduct quantity, which was an amount commensurate to that upon which his co-conspirators had been sentenced.[5] In so doing, the court arrived at an offense level of 26, to which it added two points for obstruction of justice, resulting in a sentencing range of from 97 to 121 months. Without explaining its reasons for doing so, the district court proceeded to sentence Gessa to 96 months incarceration, which it explained was similar to the sentence received by co-defendant Manolo Perez, one of Alex Gessa's other drug suppliers. This sentence was a departure not only below the 235–293 month mandated range if the 2,500 kilograms were considered but also one month below the 97–121 month range otherwise applicable.

In his appeal, Gessa asserted that the district court erred in admitting hearsay testimony from other co-conspirators. In doing so, the district court ruled the evidence admissible pursuant to Fed.R.Evid. 801(d)(2)(E) as co-conspirator statements made during the course of and in furtherance of the conspiracy. See United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); United States v. Enright, 579 F.2d 980 (6th Cir.1978). This evidentiary ruling was proper because the trial court's factual findings were not clearly erroneous, and it correctly admitted the statements as not hearsay. The majority en banc panel has affirmed this ruling in which I concur.

Gessa also challenged the district court's admission of testimony from Fleitas and Palmer, concerning two successful separate ocean rendezvous and pick-ups of bulk cocaine in excess of five hundred pounds that occurred during May or June and August of 1988, both of which were planned and executed by defendant Alberto Gessa. Defendant argued that the testimony was inadmissible under Fed.R.Evid. 404(b) as "[e]vidence of other crimes, wrongs, or

---

**5.** "Now, if the Court were to find that the appropriate offense level in this case would be calculated by including and crediting this twenty-five hundred kilograms ..., in effect, resulting in a guideline range of two hundred and thirty-five to two hundred and ninety-three months, it would be the grossest sort of disparity and distortion with regard to the co-defendants in this case." Trial Tr. Vol. V at 177–78.

acts." This ruling, too, was correct because the trial court's factual finding that the prior acts had occurred was not clearly erroneous, and the prior excursions were probative of defendant's "intent, preparation, [or] plan" to make future forays to the Bahamas for this illicit purpose. *See United States v. Robison*, 904 F.2d 365, 368 (6th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 360, 112 L.Ed.2d 323 (1990) (evidence of similar drug transactions occurring five months before time frame of conspiracy as charged in indictment admissible under Rule 404(b)). The en banc majority has affirmed that ruling of the trial court. I concur in that decision.

In its cross-appeal, the Government challenged the district court's refusal to sentence Gessa in accordance with its preliminary factual finding that Gessa and his brother had conspired to illegally smuggle 2,500 kilograms of cocaine into the United States for distribution. Thirty-eight kilos of the drugs were destined for transshipment to and distribution in Tennessee.

The guidelines mandate that the district court determine Gessa's base offense level "on the basis of ... all such acts or omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Pursuant to this section, "the *entire* quantity of cocaine attributable to a distribution enterprise *must* be used to establish the base offense level of a conspirator to the undertaking." *United States v. Miller*, 910 F.2d 1321, 1327 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991) (citing *United States v. Sailes*, 872 F.2d 735, 738–39 (6th Cir.1989)).

This language as recognized by the majority, is mandatory, not precatory, and as observed by the panel majority, the district court obviously arrived at conflicting conclusions when it decided, on the one hand, that defendant Gessa and his brother had formed a conspiracy to import 2,500 kilograms of cocaine and, on the other hand, elected to ignore that finding in imposing sentence.

Accordingly, for purposes of this appellate review, the en banc court was charged with deciding if the district court was legally justified in materially departing from the recommended sentencing range mandated by the Sentencing Guidelines to equalize defendant's sentence with those of some of his co-defendants.

The thrust of the en banc majority disposition is anchored in the exclusionary language of Application Note One to U.S.S.G. § 2D1.4 (U.S.S.G. § 2D1.4). In pursuing its reasoning that section 2D1.4 is integral to defendant Gessa's sentencing, the majority correctly observes that "a sentencing court is not *automatically* required to include the weight of an uncompleted transaction in the base level, but under Application Note One [U.S.S.G. § 2D1.4] is required to make findings with respect to defendant's *intent* and *ability* to produce the negotiated amount." (quoting from *United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991)) ("It is clear ... that § 2D1.4 contemplates that the court itself is to make findings as to whether the defendant *intended* to produce the negotiated amount [the amount contemplated by the conspiracy] and was *reasonably capable* of producing that amount.") (emphasis added). Assuming that the exceptions of section 2D1.4 are applicable, the majority correctly reasons that "Application Note One requires the sentencing court to exclude from Guideline calculation the amount of drugs that it finds the defendant *did not intend to produce* [smuggle into the United States in furtherance of the conspiracy] and *was not reasonably capable of producing* [smuggling the intended amount into the United States in furtherance of the conspiracy] ..." I must also concede that although the district court, as correctly noted by the majority, filed no formal written order or memorandum styled Findings of Fact and Conclusions of Law listing seriatim the reasons supporting its sentence (I am unaware of such a requirement), it was prolific in memorializing its reasons on the record of the sentencing hearing.

It is at this juncture that I initially part with the en banc majority's analysis in support of its disposition to remand the

government's cross-appeal to the district court *to permit it to resolve what the majority has characterized as inconsistent statements*. In a purely conclusory fashion, *without reviewing the record of the testimony* or advancing any logic or reason for its resolution, the majority categorically states that "[w]e find the district court's statements about the 2,500 kilogram amount to be confusing and in need of further clarification." The majority thereupon rhetorically conjectures:

> Was the court excluding the 2500 kilogram amount because it believed there was insufficient evidence that appellant was reasonably capable of producing [smuggling into the continental U.S.] that specific quantity of cocaine? Or was the court excluding the 2500 kilogram amount merely because the deal had never come to fruition and the court objected to the inclusion of "conversational cocaine" as long as the transaction was incomplete?

The majority proceeds to convert the latter conjecture into a non sequitur when it correctly reasons:

> According to the dictates of Guideline § 2D1.4 the district court must include the "controversial cocaine" involved in the 2,500 kilogram conspiracy even though the object of that conspiracy was uncompleted, if it concludes that appellant had the *intention to* produce [illegally smuggle into the United States] or was reasonably capable of producing [illegally smuggling into the United States] 2,500 kilograms by way of airdrop and boatlift.

Thus, there is no legally cognizable inconsistency between the district court's statements and no logically permissible basis on which to determine that the district court may have correctly applied the Sentencing Guidelines section under a "conversational cocaine" theory.

I assume, as I must, that even pursuant to the exception mandated by U.S.S.G. § 2D1.4, the en banc majority concedes that for sentencing purposes the object of the conspiracy, namely 2,500 kilos of cocaine characterized by the district court as "conversational cocaine," *must* be included, under the circumstances of the instant case, in calculating the base level of defendant Gessa's sentence if the record supports a factual finding that defendant both *intended and had the capability* to smuggle 2,500 kilos of cocaine into the United States. *Miller*, 910 F.2d at 1327 (citing *United States v. Sailes*, 872 F.2d 735, 738–39 (6th Cir.1989)).

Under U.S.S.G. § 2D1.4, it is of no consequence in calculating the base level of defendant Gessa's sentence that the objectives of the conspiracy were not realized or unsuccessful, "[u]nder the sentencing guidelines, the amount of drugs being negotiated, even in an uncompleted distribution [conspiracy] *shall be* used to calculate the total [a]mount [sic] in order to determine the base offense level." *United States v. Perez*, 871 F.2d 45, 48 (6th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *accord United States v. Gonzales*, 929 F.2d 213, 216 (6th Cir.1991); *see* Application Note One to U.S.S.G. § 2D1.4.

To avoid reversible error, the trial court in the instant action could have refused to consider the 2,500 kilos of cocaine that it characterized as "conversational cocaine" of an uncompleted or unsuccessful conspiracy in calculating defendant Gessa's base offense level only if, pursuant to U.S.S.G. § 2D1.4(a), the evidence developed during Gessa's trial and sentencing hearing disclosed that he *did not intend* to smuggle 2,500 kilos of cocaine into the continental United States for sale and distribution in furtherance of a conspiracy with his brother Alex and/or was *reasonably incapable* of smuggling that amount of cocaine into the United States for distribution and sale. The trial court, however, did not do so for obvious reasons reflected in the record.

If, upon remand, the trial court insisted upon rejecting the 2,500 kilos of cocaine it characterized as "conversational cocaine" of an uncompleted or unsuccessful conspiracy in calculating defendant Gessa's base offense level, it would repeat the reversible error of its initial decision and unnecessarily perpetuate this litigation. Under those

circumstances, the characterized "inconsistencies" conjectured by the majority opinion would be without significance beyond taxing the judicial resource.

In reviewing the transcript of the record in its entirety as it reflects upon defendant Gessa's "intention" to smuggle 2,500 kilograms of cocaine into the United States, I am mindful of the fact that it was a jury which convicted him of a Title 21 U.S.C. § 846 conspiracy, an integral element of which was proof beyond a reasonable doubt that he *intended* to commit the offense charged by § 846. The trial court endorsed the jury's verdict throughout the post verdict record by denying the defendant's motions for acquittal together with innumerable positive statements. For example:

> The Court: I also credited the proof of Camille Kohler on this importation business and the scheme of the twenty-five hundred kilo importation. I think she's telling the truth, as opposed to the Alexander Gessa business that it was a ruse to keep her from knowing he was carousing around in South Florida with Laurie Becak, and that his brother [the defendant] was a party to it.

> \* \* \* \* \* \*

> The Court: All right. Well I tell you, *I don't have any trouble sustaining a conviction* because I think its credible proof, and I accept Camille Kohler's version of it, *and that's clear by a preponderance of the evidence.*

> \* \* \* \* \* \*

> The Court: The question is, what is he to be *chargeable with as far as evidentiary basis to tie him to this twenty-five hundred kilogram importation*

*business.* I tell you, I credit Camille Kohler's testimony ... I think she's called it as it was told to her, *that this is an* § 846 *conspiracy.* I think its worthy of credit.

Exc. from Sent. at 18–19, 27, 34 (emphasis added).

The Court, responding to defendant's counsel concerning the 2,500 kilogram conspiracy, stated:

> *Let me tell you this, Mr. Ray. You know all of this was raised at the trial of this case, submitted to the jury, and the jury found against your client in favor of the Government.*

> Mr. Ray: We don't know that they found on this particular point, Judge....

> The Court: That may be, but in any event, it was—and it was in the proof, subject to instructions, it was submitted along with all their proof to the trier of the fact.

> *I'm not troubled, I tell you with finding there is—by a preponderance of the evidence there is a factual basis to sustain this in the record.*

*Id.* at 16–17 (emphasis added).

Moreover, this en banc court in its instant decision has affirmed the trial judge's evidentiary rulings and the jury's verdict. Certainly, the issue of defendant Gessa's intent to further a conspiracy to import 2,500 kilos of cocaine as decided by the jury, endorsed by the trial court, and affirmed by this appellate review would be irreversible by the trial court upon remand.

The defendant Alberto Gessa's *reasonable capability* to smuggle 2,500 kilos of cocaine—or more precisely, given the guidelines in effect at the time of the offense, 50 or more kilograms of cocaine [6]—

---

**6.** The government asserts that defendant's guideline range must be calculated upon a base level offense of 2500 kilograms of cocaine that the district court found to be a part of the § 846 conspiracy. Guideline Section 2D1.4(a) provides that "[i]f a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed" (in the instant case, U.S.S.G. § 2D1.1). Under the version of Guidelines § 2D1.1 in effect at the

time of the charged offense, conspiracies involving 50 or more kilograms of cocaine were assigned a base offense level of 36. U.S.S.G.App. C, amendment 125 at 90 (1991) (former U.S.S.G. § 2D1.1(c) establishing drug quantity table applicable to offense prior to November 1, 1989). Thus, the guidelines applicable to defendant did not differentiate between quantities in excess of 50 kilograms. Accordingly, if defendant Gessa intended to smuggle any amount of cocaine in excess of 50 kilograms and was reasonably capable of smuggling any amount of cocaine in

into the United States also is uncontroverted and confirmed by the record.

There is nothing that reflects success better than success itself. The defendant's demonstrated seamanship, navigational skills as an "experienced sea captain," his access to mega sources of cocaine, his ability to fund the purchase price of at least 250 kilograms (550 pounds) of cocaine in a single transaction and more probably an aggregate 500 kilograms (1,100 pounds) in the two operations between May/June and August of 1988, and his ability to successfully plan and execute rendezvous in the open seas off the Bahamian islands and to successfully smuggle mega cargos of cocaine into the United States for sale and distribution, as related by the uncontradicted credited testimony of Kohler, Fleitas, Palmer and Becak, is a testament of his capabilities to successfully implement the conspiracy.

Apart from the en banc majority's editorialized interpretations of the trial testimony, which are in material conflict with the trial and sentencing transcripts, the findings of the trial judge and this dissent, the majority misconceives the underlying implications of Application Note One to U.S.S.G. § 2D1.4 as it concerns the defendant's intent to implement the conspiracy conceived by him and his brother Alex and defendant's reasonable capability to successfully smuggle 2,500 kilograms into the continental United States.

A redundant discussion of the defendant's intent to accomplish the purpose of the conspiracy would serve no purpose, that issue having been decided by a jury verdict which was endorsed by the trial judge and affirmed by this court.

The reasonable capability of the defendant to organize and successfully conduct a mega cargo cocaine smuggling operation into the United States was attested to by the credited testimony of Kohler, who testified that "he [Alex Gessa] was going to participate with his brother [defendant] to bring twenty-five hundred kilos of cocaine in the same way his brother [defendant] had brought back cocaine in July

excess of 50 kilograms into the United States,

[1988].... [f]rom Colombia through airdrop out in the ocean.... [with] [h]is brother organizing the drop" (Trial Tr. Vol I at 47, 68) and by the testimony of co-conspirators Fleitas and Palmer who were recruited and paid by the defendant to assist in the May/June and August operations.

The testimony of Fleitas and Palmer concerning the defendant's capability to successfully conduct smuggling operations of magnitude is convincing and without need of interpretation. They related the details of a sea smuggling expedition during May or June of 1988 that successfully landed 250 kilos [550 pounds] of cocaine in Miami, Florida after its acquisition on the open seas off the coast of Green Turtle Cay in the Grand Bahama Islands. They testified that "Albert took care of everything," including the navigation (the radius of action from Miami, Florida to the Grand Bahama Islands is approximately 200 miles of open sea and commands the skills of an "experienced sea captain," especially if the passage requires evasion of United States and Bahamian Coast Guard patrols), the courses to be followed, the "destination" rendezvous, the communications that were necessary between "the people waiting there for us," including paying Fleitas and Palmer for their services. Trial Tr. Vol. III at 27–32. Fleitas participated in a second successful operation in August of 1988 of equal or greater magnitude considering the promised increased pay of $40,000 he was to receive for his services (he allegedly received $17,000 cash plus 3 kilos of cocaine). The credited testimony of Kohler, Fleitas, Palmer, and Alarcon, which has been recapitulated below, highlight only a part of the conflict between the majority's edited version of the record and the transcription of their actual testimony.

Kohler testified that Alex told her that "he was going to participate with his brother to bring twenty-five hundred kilos of cocaine the same way his brother had brought back cocaine back in July [1988]." Trial Tr. Vol. I at 46. Kohler further testified that:

the assigned base offense level was 36.

Q. When did you become aware of this plan and how did you become aware of it?

A. In September of 1988 Alex decided to go to join his brother in the venture to bring in two thousand five hundred kilos of cocaine.

Q. Where was this cocaine supposed to be obtained?

A. *FROM COLUMBIA [sic] THROUGH AIRDROP OUT IN THE OCEAN.*

Q. Did Alex indicate how many people were to be involved in this, how large an operation it would be?

A. Just a lot of people, several small boats and larger boats.

Q. Small and large boats?

A. Yes.

Q. Did Alex indicate who was going to organize this, put it together?

A. Yes. He and his brother were going to organize it. His brother organizing the drop and then he, Alex, was going to organize the boats that were going to be further in closer to shore.

 \* \* \* \* \* \*

Q. What was Alex supposed to get out of this operation?

A. He was supposed to be paid with thirty-eight kilos.

Q. Of what?

A. Cocaine.

Q. What was he supposed—what was going to be done with these thirty-eight kilos?

A. He was going to bring them to Tennessee and sell them.

Id. at 68–69 (emphasis added).

Sergio Alarcon, a co-defendant, also testified to the existence of a "load" of cocaine:

Q. Were you aware that between September and December of 1988 of a plan to import a large amount of cocaine into the United States through Florida.

A. I heard it from Alex, yes.

Q. What did Alex tell you about that?

A. That they were going to bring in a load.

Q. Who is they?

A. The organization.

Q. Did you indicate who in the organization was going to participate in this?

A. Him, his brother, and—

Q. When you say, his brother, who do you mean?

A. Albert, Alberto.

Q. That's what Alex told you?

A. Yes.

Q. What were they supposed to do?

A. Bring in a load, that's all I know.

 \* \* \* \* \* \*

Q. Did you have any discussions with Camille Kohler about these efforts?

A. About they were going to make a lot of money, and we're going to retire.

Trial Tr. Vol. II at 51–52.

Moreover, Fleitas testified to Alberto Gessa's capability of smuggling large bulk cargos of cocaine via boat-lift into the United States:

Q. Do you have any knowledge as to whether Alberto Gessa has the ability or capability of engaging in that kind of [large cocaine importation] scheme of your own personal knowledge?

A. Yes.

Q. How do you know about that?

A. Well, I was involved with Alberto Gessa personally in a smuggling trip.

Q. Smuggling what?

A. Cocaine.

Q. When did that take place?

A. I was involved in two smuggling ventures which took place between May and August of '88.

 \* \* \* \* \* \*

Q. Who was along on the first trip that you are speaking of now?

A. Eli Palmer.

Q. And how was it you became involved in that episode?

A. Well, I was approached—

Q. By whom?

A. By Albert, to take place in this—on smuggling.

Q. What did you tell us was going to happen?

A. We were to take a vessel from Miami and go to the islands and pick up a load.

Q. All right. Let me slow you up here. What island?

A. We were to go to this island in the Grand Bahamas called Green Turtle Cay.

Q. What was supposed to happen once you got out there?

A. We were supposed to pick up cocaine at that island and bring it back to the vessel.

Q. From whom?

A. I have no knowledge of that.

Q. Alberto Gessa did not tell you that?

A. No.

Q. Did he tell you how much cocaine you were supposed to bring back?

A. Not that I can recall, no, sir.

Q. Did that trip actually take place?

A. Yes, it took place.

Q. Was it is a successful trip?

A. Yes, sir.

Q. When did that occur, approximately?

A. The first one, I'm not too good with dates, I know they both took place in May and August. I know they were— the second was almost—was done within a month or a month and a half, back to back.

Q. How much did you get paid for your participation in that trip?

A. On the first load?

Q. Yes.

A. I received $15,000.

THE COURT: How much?

THE WITNESS: $15,000.

Q. (By Mr. Hester:) You mentioned another trip in August, second trip in August.

A. Yes, sir.

Q. Tell us how that came about.

A. Well, the second load, I was approached again and asked—

Q. By who?

A. By Albert, to go on this venture again. This time it would be just myself and him. And it just fell right into place like the other one.

Q. Who made the arrangements as far as the boat, obtaining the boat to take on these trips?

A. I mean, Albert took care of everything. It was—I was just—everything was there.

* * * * * *

Q. Who navigated and picked the routes that were going to be followed to get to the destination?

A. Alberto.

Q. Do you know who arranged for the communications that were necessary between your group and the people you were supposed to meet out there? Who communicated with them?

A. Once we arrived at the island, Albert was contacted by the people waiting there for us.

Q. How was he contacted?

A. Once we came in this little boat kind of came behind us. They knew what boat we were coming in, and knew who we were I guess by the vessel.

Q. Now, was the second trip successful as far as bringing back—

A. Yes, it was.

Q. How much were you to be paid the second trip?

A. The second trip I was promised to get paid anywhere from twenty-five to forty thousand dollars, around there.

Q. This was just the two of you?

A. Just the two of us. I was promised more money.

Q. Did you ever get paid?

A. I got paid but not the whole amount.

Q. How much did you get paid?

A. I was partially paid, I must have received around another $17,000.

Q. After that episode, were you involved with Alberto Gessa again at all?

A. No.

Trial Tr. Vol. III at 27–32.

Testimony from Kohler indicated that, in addition to money, Fleitas also received three kilos of cocaine for his participation in the last boat-lift operation.

Eli Palmer, another co-defendant, testified that defendant was capable of executing large importations of cocaine:

Q. Now, Mr. Palmer, do you have any knowledge from your own observation or involvement with a plan to import twenty-five hundred kilos into Florida by boat, this plan being participated in by Alberto and Alex Gessa?

A. No, sir, I don't.

Q. Do you have any knowledge from your own observations or experience as to whether Alberto Gessa would be capable of engaging in such endeavor?

A. Yes, sir.

Q. What is the basis of your knowledge concerning that?

A. I was involved in an operation that we imported—we smuggled cocaine into Miami.

Q. When did it happen?

A. In June of '88.

Q. Who else was involved?

A. Jay, with me.

Q. Do you know his last name?

A. Fleitas.

Q. Who approached you about this plan?

A. Mr. Gessa.

Q. Which one.

A. Albert.

Q. What did he tell you was supposed to happen?

A. We were just to go out on the water and pick up the cocaine.

Q. Where were you supposed to go?

A. I wasn't sure at the time, but after I got there it was—

Q. Where did you end up going?

A. In the Bahamas.

Q. Do you remember the name of the particular place?

A. Green Turtle Cay.

Q. How many of these trips did you make?

A. Just one.

Q. How much were you supposed to get paid for that?

A. Well, I ended up getting $10,000.

Q. How much were you supposed to get?

A. More.

Q. Was this trip successful?

A. .Yes, it was.

Q. How much cocaine did you bring back?

A. *TO MY KNOWLEDGE IT WAS TWO–HUNDRED AND FIFTY KI'S.*

Q. How many boats were involved in this trip?

A. How many boats? Just ours.

Q. Did you put up any money in this venture for the purchase of the cocaine?

A. No, sir.

Q. Who did that, who handled that?

A. I guess the people that he was involved with.

Q. You don't know for sure?

A. No.

Q. How about obtaining the boat that you used, who made the arrangements for that?

A. Albert.

Q. Who determined which route you were going to follow?

A. Albert. I had never been on the water before.

\* \* \* \* \* \*

Q. Were you ever approached again by Alberto Gessa to make drug trips?

A. Yes, I was.

Q. And you turned him down?

A. Yes, sir. Once was enough.

Id. at 62–65 (emphasis added).

The significance of the Kohler, Fleitas and Palmer testimony is the defendant's demonstrated access to a mega source of cocaine whether situated in Colombia or the Grand Bahamas, his capability to purchase and finance quantities of 250 or more kilograms [7], and his demonstrated skill and experience in successfully evading interdiction by the United States and Bahamian

7. It is reasonable to infer from the testimony of Kohler, Fleitas and Palmer that, in the absence of any other identifiable participant in either of the two smuggling operations, that the defendant paid for the cocaine involved.

authorities and landing those cargos in the United States.

If the defendant had a Colombian drug connection as related in the credited testimony of Kohler, or whether 250/probably 500 or more kilos of cocaine he purchased during June/August of 1988 were air-dropped or on-loaded from another vessel on the open sea, or acquired from land installations on Green Turtle Cay is totally without significance. The bottom line in judging the defendant's capability of producing and reasonably smuggling 250 or more kilos of cocaine into the United States was his demonstrated ability to do so. He did it on two separate known occasions between June and August of 1988. That evidence is uncontroverted and beyond equivocation.

In commenting upon the capability of the defendant to produce quantities of cocaine in excess of 50 kilograms necessary to invoke a base offense level of 36 pursuant to the mandate of Guidelines section 2D1.1 in effect at the time of this offense, the panel majority erroneously observes that the government has failed to prove the defendant's ability to produce cocaine in the quantities required to support a base offense level of 36. This significant legal misconception further erodes the integrity of the majority's disposition since it should be noted that the government *does not have that burden of proof as assigned by the majority.* This Circuit and every circuit that has addressed the issue has assigned that burden to the defendant. *United States v. Rodriguez,* 896 F.2d 1031 (6th Cir.1990).

In *Rodriguez,* this Circuit determined who had the burden of proving factual issues that would decrease a sentence. In arriving at its decision, this Court reasoned that

[t]he burden of proof is ordinarily placed upon the party who benefits from the establishment of a fact. Moreover, mitigating circumstances are more likely to be within the defendant's knowledge than the government's. They may require the defendant's testimony which

the government may not be able to compel.

\* \* \* \* \* \*

and decided that

[w]e now expressly reject *Dolan's* requirement that the government bear the burden of proof on factual issues that could decrease a potential sentence.

*Rodriguez,* 896 F.2d at 1033. *See United States v. Christian,* 942 F.2d 363, 368 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 905, 116 L.Ed.2d 806 (1992); *United States v. Monroe,* 943 F.2d 1007, 1019 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992); *United States v. Williams,* 940 F.2d 176, 181 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991); *United States v. Kingston,* 922 F.2d 1234, 1240 (6th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991); *United States v. Wyckoff,* 918 F.2d 925, 928 (11th Cir.1990).

In the instant case, the defendant made no effort to rebut the uncontroverted testimony of Kohler, Fleitas, and Palmer, let alone carry his burden to affirmatively prove by a preponderance of the evidence that he was incapable of smuggling 2,500, 250 or even 50 kilograms of cocaine into the United States.

Having gone full circle in addressing the panel majority's envisioned but non-existent material "inconsistencies," and the non-issues of the defendant Gessa's intent and reasonable capability to successfully plan, finance and execute a venture of the magnitude contemplated by the instant conspiracy, there remains only the consideration and disposition of the single assignment of error charged by the government in its cross-appeal. That single assignment of error, simply stated, challenges the trial court's departure from the mandates imposed by the Sentencing Guidelines solely to "harmonize" or "equalize" a defendant's sentence with those of his co-defendants.

Here again the resolution of the assigned error is disclosed from a reading of the record of proceedings and the existing legal pronouncements of this Circuit and ev-

ery other circuit that has considered the issue.

Contrary to the suggestions of the majority, the reason for the trial court's departure from the correct guideline sentencing range of 235 to 293 months imprisonment calculated upon a base offense level of 36 in effect at the time of the conspiracy to produce [smuggle into the United States] 50 or more kilos of cocaine—in the instant case either 250 or 2,500 kilos—is again apparent from a reading of the record of the sentencing hearing.

The trial court's good faith reservations for imposing what it characterized as a "draconian" sentence of between 235 and 290 months of imprisonment to be served by the defendant is repeated continuously throughout the sentencing hearings. Those reservations were anchored in the lesser sentences the court had imposed upon the remaining defendants that ranged from ninety-seven months to twelve months depending upon the degree of their respective involvements. Alexander Gessa received a sentence of three hundred and sixty months.

The thrust of the trial court's well-intentioned but erroneous reasons may be summarized in the following statements which followed a monologue crediting Kohler's credibility after observing her testify during three previous trials and after finding the existence of a viable conspiracy to import 2,500 kilos of cocaine into the United States:

> But that again brings us back to the point that while I credit Camille Kohler's testimony, it's a question of whether that should be the basis of punishing this man for an extraordinary amount of cocaine. That's what I call conversational cocaine. And I've got some real problems about punishing people about having conversations about cocaine that hasn't ripened into something more solid, ... what I mean by conversational cocaine.
>
> Now, it's one thing to have the proof for purpose of conspiracy and to obtain conviction, submit it to the jury, and even another thing for the Court to credit it, and I have credited it. As I said, I believe it by a preponderance of the evidence here at the sentencing proceedings. But I simply do not believe that that alone, with nothing more, is sufficient to impose what would be in this case draconian sentence.
>
> If the Court were to accept that testimony as it has accepted, but if the Court were to impose sentence on the basis of the proof, it would result in a total adjusted offense level, allowing the two level upward adjustment for obstruction of justice, of thirty-eight, resulting in a guideline range of two hundred and thirty-five to two hundred and ninety-three months.
>
> * * * * * *
>
> Now, if the Court were to find that the appropriate offense level in this case would be calculated by including and crediting this twenty-five hundred kilograms which would require it to credit fifty kilograms, in effect, resulting in a guideline range of two hundred and thirty-five to two hundred and ninety-three months, it would be the grossest sort of disparity and distortion with regard to the co-defendants in this case. They are all members of the same conspiracy.
>
> When the main case was tried, the Government didn't advance this business. It wasn't until this defendant was taken into custody, and as the tail end of all the defendants was tried, that this aspect of the matter was advanced, and the Court rejects that. It simply isn't right.
>
> What we have here is proof of some two and a half to three or three and a half kilograms of cocaine brought up here from South Florida to the Middle District of Tennessee that this man has been directly, concretely connected with. And I simply find that the rest of this is what I have repeatedly called this afternoon as conversational cocaine [alluding to the substantive count to transport, distribute, and sell 2.5 to 3 kilograms of cocaine within the Middle District of Tennessee].
>
> It's one thing to put it in the record, place his role in bringing about whatever the value the jury attaches to it, result-

ing in conviction on a Section 846 drug conspiracy count. And then it's a matter of fact, while I thought a large part of all this proceedings this afternoon and on two prior occasions with these objections was very much like we are seeing more, more and more in all of these sentencing proceedings, sort of a mini-trial, we finally at the last got down to the crux of the case, and that is what has this man actually been chargeable with for purposes of imposition of sentence.

And I find that it's two and a half, three, three and a half, kilograms of cocaine which under the computations of the guidelines in effect at the time results in an offense level of twenty-eight, and allowing for two level increase for obstruction of justice about which there is no controversy, and it goes to that portion, Paragraph 22 of the pre-sentence report, withdrawn, results in a total offense level of thirty with Criminal History Computation of I, resulting in a guideline range of ninety-seven to a hundred and twenty months, and a fine range of $15,000 to $150,000, and a period of supervised release of at least five years on Count One and at least four years on Count Eleven.

The foregoing constitutes the Court's finding as to the guidelines.

Exc. from Sent. at 28, 40–44.

The trial court knew precisely what it was doing as evidenced by its reflection that

I don't have any trouble sustaining a conviction because I think it's credible proof and I accept Camille Kohler's version of it, and that's clear by preponderance of the evidence. But, I'm telling you, Mr. Hester, I'm having some trouble about punishing a man over what I call conversational cocaine. If I'm wrong, you can—*I SUPPOSE [IF] EITHER SIDE THINKS I HAVE IMPROPERLY APPLIED THE GUIDELINES, FAILED TO FOLLOW THEM, YOU HAVE CLEAR OPPORTUNITY TO HAVE THE COURT OF APPEALS REVIEW IT.*

*Id.* at 33–34 (emphasis added).

The government followed the trial court's suggestion and assigned error to the court's imposed sentence in its cross appeal to this Court.

The trial court accordingly ignored the mandate of the Sentencing Guidelines and concluded that the applicable 235–293 month guideline range exceeded the sentences received by other members of the conspiracy and resulted in "the grossest sort of disparity and distortion with regard to the co-defendants in this case." The court thereupon equalized defendant Gessa's sentence to 96 months which was similar to the sentence imposed upon Manolo Perez, one of Alex Gessa's other lesser suppliers. The sentence was a downward departure not only from 235–293 month applicable range applicable to conspiracies involving 50 ore more kilos of cocaine—250 to 2,500 kilos in the instant case—but also one month below the 97–121 month range otherwise applicable.

This Circuit has consistently refused to endorse a guideline departure to "harmonize" or "equalize" one defendant's sentence with the sentences of co-defendants. *United States v. LaSalle,* 948 F.2d 215 (6th Cir.1991); *United States v. Rutana,* 932 F.2d 1155, 1159 (6th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991); *United States v. Parker,* 912 F.2d 156, 157 (6th Cir.1990).

Every other circuit that has considered the issue is in accord with this Circuit's resolution denying upward or downward "equalization departures" from an appropriate guideline range. *See United States v. Jackson,* 950 F.2d 633, 637–38 (10th Cir. 1991) (citing *United States v. Trujillo,* 906 F.2d 1456 (10th Cir.), cert. denied, —— U.S. ——, 111 S.Ct. 396, 112 L.Ed.2d 405 (1990)); *United States v. Wogan,* 938 F.2d 1446, 1447 (1st Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991); *United States v. Joyner,* 924 F.2d 454, 459–61 (2d Cir.1991); *United States v. Hendrieth,* 922 F.2d 748, 752 (11th Cir. 1991); *United States v. Cea,* 914 F.2d 881, 889 (7th Cir.1990); *United States v. Torres,* 921 F.2d 196, 197 (8th Cir.1990) (per curiam); *United States v. Carpenter,* 914

F.2d 1131, 1135 (9th Cir.1990) (citing *United States v. Enriquez–Munoz*, 906 F.2d 1356, 1358 (9th Cir.1990)); *United States v. Boyd*, 885 F.2d 246, 248–49 (5th Cir.1989).[8] The District of Columbia and the Third Circuits apparently have not addressed the issue.

In *United States v. Nelson*, 918 F.2d 1268 (6th Cir.1990), decided subsequent to *United States v. Parker*, 912 F.2d 156 (6th Cir.1990), a panel of this Circuit concluded that it was "not improper *as a matter of law* for a district court to depart downward in an attempt to generally conform [one co-conspirator's] sentence with the sentence of [other co-conspirator's]" (emphasis in original). The court proceeded to explain that:

> we cannot say, as a matter of law ... that there could *never* be a situation in which strict letter application of the guidelines would result in an unreasoned disparity of sentences among multiple criminal defendants guilty of a single criminal transaction such that a district court would be justified in departing from the guidelines in order that reasonable sentence conformity might be achieved.

*Nelson*, 918 F.2d at 1272 (emphasis added). Upon revisiting *Nelson*, its reasoning recognizes a reasonable extension of *Parker* and poses no conflict with the *Parker* precedent. The *Nelson* appellate review ultimately disallowed the trial court's departure from the appropriate guideline range applicable in that case as unreasonable. The *Nelson* decision has received favorable scholarly comment and "rest[s] upon a thoughtful analysis of the congressional intent underlying the Sentencing Reform Act." Weich, *The Strange Case of the Disappearing Statute*, 3 Fed.Sent.Rep. 239, 241 (1991).

In the instant case, the defendant's key role and assigned responsibility in furthering the objectives of the conspiracy to smuggle 2,500 kilograms of cocaine into the United States for distribution and sale was second to no one and certainly not comparable to the lesser co-defendants whose sentences served as the standard for the trial court's "equalizing" departure from the sentencing range mandated by the guidelines. Contrary to the district court's observations, it was the defendant, not his brother Alex, who was the more culpable participant of the instant joint criminal venture. It was the defendant who was the "experienced sea captain", the navigator who was intimately familiar with Bahamian and Florida waters, the individual with the alleged Colombian connections, with demonstrated capabilities and know-how to successfully plan, finance and execute coordinated boat-lifts of bulk cocaine exceeding 250 kilograms in a single operation, evade Bahamian and U.S. Customs interdictions and inspections and illegally enter those cargoes of magnitude into the United States. He was the ever present volume pipe-line of cocaine that supplied well-organized distributors such as his brother who operated thirty or more mules, wholesalers, sub-distributors and street peddlers within the Middle District of Tennessee. He was the life's blood of any cocaine distribution system.[9]

Moreover, his sentencing disparity was self-induced by his fugitive status. Had he been available for his scheduled appearances and trial along with his co-defendants while only Kohler's uncorroborated testimony attested to the conspiracy to smuggle 2,500 kilograms of cocaine into the United States, he too would have benefited from the prosecution's inability to produce corroborating evidence concerning the 2,500 kilogram conspiracy and the then

---

**8.** In the Fourth Circuit there appears to be some ambiguity, however, its pronouncements seem to be weighted in favor of aligning with existing consensus voiced by other circuits.

**9.** Logic dictates that it is reasonable to infer from the evidence developed during the trial and presentence hearings conducted by the district court that any individual who has demonstrated access to mega sources of available co-

caine, the capability to organize, finance and successfully implement the illegal entry of 250 or more, probably 500 kilograms (1100 pounds—a half ton), of cocaine into the United States during a two and one-half month period is an ever present volume pipeline of cocaine that is capable of supplying well-organized distributors, such as Alex Gessa.

A.U.S.A.'s decision to focus only on the "domestic portion" of the case.

Unfortunately for the defendant, during his nine month fugitive status, the government developed additional evidence that corroborated Kohler's disclosure of the 2,500 kilogram conspiracy and defendant Gessa's intent and capability to plan, finance and execute mega-kilogram importations of cocaine into the United States. Codefendant Fleitas who became a government witness testified without contradiction to participating in two successful smuggling operations. Eli Palmer was unknown to A.U.S.A. Strianse while he was trying or disposing of the charges against defendant's co-defendants. Palmer also provided uncontradicted testimony of defendant's seamanship, navigational skills and his ability to successfully plan, finance and execute an ocean rendezvous, a boat-lift of at least 250 kilograms of cocaine into the United States. The defendant should not be permitted to seek the exception of *Nelson* where his own wrongful conduct induced any sentencing disparity.

Assuming, *arguendo*, that the trial court had applied the appropriate guideline, the defendant's sentence would not have been disparate when compared with that of his brother Alex who was the only individual who was similarly situated in the conspiracy. While defendant may argue that he was less culpable, his sentence if correctly calculated in accordance with the appropriate guideline range, i.e., 235 months, would have been only two-thirds as severe as his brother's sentence of imprisonment for 360 months. Under the facts of this case, when compared with the 360 month sentence of imprisonment that Alex received, defendant's sentence was, if anything, too lenient rather than too harsh.[10] Thus, the application of the *Nelson* exception is unwarranted in the disposition of this action.

Having reviewed and responded to the disposition of the en banc majority which seeks to invoke the exceptions of U.S.S.G. § 2D1.4, it would appear as Judge Kennedy notes in her dissent, that Application Note One to section 1B1.3 (Relevant Conduct) (section 1B1.3) rather than section 2D1.4 is the more legally correct sentencing guideline that is applicable to the sentencing of

---

10. In taking exception to the dissent's characterization of the defendant's culpability, the majority relies upon a less than persuasive and misconceived argument when it observes that

> the record does not support the dissent's statement that defendant was the *"ever present volume pipeline of cocaine that supplied well-organized distributors such as his brother."* This statement is contrary to what the United States argued in regard to defendant. In its closing argument, the prosecution stated that defendant was *not* one of the primary suppliers in his brother's distribution ring, and that the United States was "not arguing for an instant that he was the lead, primary supplier of cocaine in this case." Appendix, p. 319.

Majority Op. at 1268.

A review of the Joint Appendix at 319 discloses that the above characterization of the government's position evaluating defendant's culpability is incorrectly stated. The quotation, read in context:

> *Alberto Gessa,* while not arguing for an instant that he was the lead, primary supplier of cocaine in this case, the testimony from Camille Kohler verifies, ... [that] Alberto Gessa participated in this conspiracy.

J.App. at 319 (emphasis added).

In sum, the quotation concerning defendant's culpability attributed to the prosecutor's closing argument is in reality the defendant's self-serv-

ing evaluation of his own culpability and not the position advanced by the government.

The government's position, as paraphrased and adopted by this dissent, contrary to the edited majority version, is best expressed in its brief before this Court when it argued that

> [t]he codefendant most similarly situated to defendant was his brother Alex, who pleaded guilty to a single count of operating a continuing criminal enterprise and was sentenced to a mandatory 30-year prison term under 21 U.S.C. 848. While defendant might argue that he is less culpable than his brother, even under a straightforward application of the guidelines defendant's sentence could have been only two-thirds as severe as his brother's sentence (235 months compared to 360 months). Nor is it clear that defendant was much less culpable than Alex. While Alex clearly was the leader of the Tennessee organization, it was defendant to whom he turned when he was unable to obtain cocaine elsewhere. Most important, with respect to the 2500 kilogram transaction, it clearly was defendant rather than Alex who was in charge and who had spearheaded similar operations in the past. Thus, when compared to the 360-month sentence that Alex received, defendant's 235-293 month guideline range was, if anything, too lenient rather than too harsh.

Supp.Brief at 21-22.

the defendant Gessa who, together with his brother Alex, were the two primary conspirators who planned to illegally smuggle 2,500 kilograms of cocaine into the United States. As Judge Kennedy observes and as logic dictates, given the trial court's credibility assessments of Kohler's testimony that the brothers Gessa planned to smuggle 2,500 kilograms of cocaine into the United States, even the reasonable foreseeability exception of section 1B1.3 is not an issue with respect to Alberto Gessa's own agreement. Accordingly, since the defendant has failed to introduce any evidence or proof, which was his burden, that his "conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake" (section 1B1.3), then his offense level should be "the same as if the object of the conspiracy ... had been completed." U.S.S.G. § 2D1.4.

Judge Kennedy correctly concludes that section 2D1.4 applies only to uncompleted, attempted sales and is intended to limit the offense level where the defendant was "puffing" and where the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount. The transcript of the government's uncontroverted testimony in the instant case which has been totally ignored by the en banc majority in arriving at its resolution, precludes the defendant from invoking the exceptions of U.S.S.G. § 1B1.3 for the reasons more fully discussed hereinbefore and in Judge Kennedy's dissent.

As noted earlier in this dissent, the government's affirmative proof of defendant's demonstrated intention and capability to illegally smuggle 2,500 kilograms of cocaine into the United States is uncontroverted and the defendant is accordingly foreclosed from invoking the exceptions of section 2D1.4, if that provision is applicable.

Accordingly, I would concur in the majority's conclusions that defendant's assignments of error are not well-taken and af-firm the district court's evidentiary rulings and dispositions.

However, if I were writing for the majority of the en banc court, I would, upon this comprehensive and totally reviewable trial and post-trial record, including the sentencing hearings conducted by the trial court, confront and decide the single simple issue joined by government's cross-appeal and finally dispose of the case with a decision of precedential value that would justify the consideration of an en banc court.

I would reaffirm this Circuit's pronouncements in *Parker* and *Nelson* as the precedent of this Circuit, declare the government's assignment of error to be well-taken and vacate the sentence of imprisonment imposed upon defendant, and remand the case to the district court with instructions to resentence him in accordance with the appropriate guideline range not inconsistent with this dissent.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I generally concur in Judge Krupansky's opinion but write separately to focus more particularly on what I see as my disagreement with the majority.

I start with the guideline itself. It reads:

(a) Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

In this case, the trial court specifically found the object of the conspiracy to encompass the 2,500 kilo importation scheme. ("I also credited the proof of Camille Kohler on this importation business and the scheme of the twenty five hundred kilos importation.") A straightforward application of the relevant guideline mandates an offense level based upon 2,500 kilograms of cocaine.

Both Judge Contie and Judge Krupansky discuss the need to make findings with respect to a defendant's intent and ability to produce a specified amount, 2,500 kilo-

grams, relying on Application Note 1 [U.S.S.G. § 2D1.4]. The note provides:

> If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, each conspiracy transaction shall be included with those of the substantive counts of conviction to determine scale. If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing. If the defendant is convicted of conspiracy, *see* Application Note 1 to § 1B1.3 (Relevant Conduct).

It seems clear to me that the "negotiated amount" language of the pertinent sentence refers back to the previous sentence's "uncompleted distribution" of an amount "under negotiation." Both sentences involve determining the amount for which a defendant is liable when the negotiations are for more than the actual transactions and attempts. The language is aimed at establishing the liability for an attempted sale. I do not think those two sentences are the *proper authority for* determining or limiting the scope of a conspiracy. Indeed the last sentence of the section specifically says "[i]f the defendant is convicted of conspiracy, see Application Note 1 to § 1B1.3 (Relevant Conduct)." There Application Note 1 provides:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. *Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.* (Emphasis added)

It is that note which controls in the case of a conspiracy and limits the scope of a conspirator's liability.

My construction of the applicable guidelines and notes is supported by the history of the relevant sections. Prior to the 1989 amendments, Application Note 1 to § 2D1.4 contained the following sentence regarding the proper scope of the object of a conspiracy: "the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to defendant or was reasonably foreseeable." That language was replaced with the simple *"see* Application Note 1 to § 1B1.3 (Relevant Code)" reference to the parallel language in Application Note 1 to § 1B1.3 U.S.S.G.App. C, # 137. It is clear to me that under section 2D1.4 and its referenced commentary, a defendant is liable for the full scope of the object of the conspiracy, unless it is established that the amount or conduct in question was beyond the scope of defendant's agreement and was not foreseeable by the defendant. The testimony explicitly credited by the trial court stated that Alberto Gessa and his brother planned to import 2,500 kilos of cocaine, with Alberto handling the drop and Alex the ferrying. Therefore, Alberto Gessa's conspiracy agreement involved 2,500 kilos of cocaine, foreseeability is not an issue with respect to his own agreement, and his offense level "shall be the same as if the object of the conspiracy ... had been completed." U.S.S.G. § 2D1.4.

The language relied upon by both Judge Contie and Judge Krupansky from Application Note 1 to § 2D1.4 applies, in my opinion, only to uncompleted, attempted sales. It is intended to limit the offense level where a defendant was "puffing," i.e., negotiating upon an amount beyond his intent and capacity to actually sell. My reading of this section is also supported by the commentary to the amendments. *See* U.S.S.G.App. C, # 136 ("[The previous] provision may result in inflated offense levels in uncompleted offenses where a defendant is merely 'puffing'.... The purpose of [the] amendment is to provide a more direct procedure for calculating the offense level where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount.") The intent and capacity analysis has no proper application to the scope of the object of a conspiracy.

I see no reason to remand this case to the District Court, since I believe the record before us is clear. The court found the defendant had entered into a conspiracy, the object of which was 2,500 kilograms. After recognizing that its findings regarding the conspiracy required a sentence range at level 38 of 235 to 293 months,[1] the District Court departed from that guideline for two reasons. First, it held that the sentence should be based on the amount of the drugs actually distributed by the conspiracy, rather than the amount it conspired to import. It did so because utilizing what the conspiracy planned to do in the future but had not achieved resulted in what the court considered to be a draconian sentence. It also declined to apply the calculated guideline and thus departed because use of the guideline mandated sentence would result in the "grossest sort of disparity and distortion with regard to the co-defendants" who were all members of the same conspiracy. The judge found that defendant's role was similar to that of co-defendant Manolo Perez, who received ninety-seven months, and imposed an identical sentence. Although the court did not use the term "departure," that is what it did—it departed from the guideline range it recognized to be required by its factual findings. Neither of its grounds are a valid basis for departure.

The majority suggests that the judge's findings are ambiguous and that by "conversational" cocaine the court may have meant that there was in fact no conspiracy to import 2,500 kilograms of cocaine. I find nothing in the court's remarks to suggest that conclusion. The court repeatedly stated that it credited the witnesses who established a conspiracy to import a substantial amount of cocaine. It found that the conspirators had taken overt acts to carry out the conspiracy. The amount that would be imported was "conversational" only because the importation and distribution had not taken place. It was nonetheless what they intended to do. Under section 2D1.4, that dictates the appropriate offense level. The only legitimate reduction from the 2,500 kilograms finding under the guidelines would relate to whether the acts of others were foreseeable, or not within the scope of the agreement.[2] The expressly credited testimony precludes this consideration.

I agree with Judge Krupansky that the court could not, under the circumstances here, depart downward to avoid disparity

---

1. The court stated: "If the court were to accept that testimony [the testimony regarding the conspiracy to import 2,500 kilos] *as it has accepted it,* but if the Court were to impose sentence on the basis of the proof, it would result in a total adjusted offense level, allowing a two level upward adjustment for obstruction of justice, of thirty-eight, resulting in a guideline range of two hundred and thirty-five to two hundred and ninety-three months." (Emphasis added).

2. If I am incorrect in my reading of the guidelines, I would agree with Judge Krupansky that the judge could have adjusted the guideline level if the conspirators did not have the capacity to import the amount they conspired to. Application note 1, U.S.S.G. § 2D1.4. The evidence that the court expressly stated it credited established that the conspiracy, indeed, through the defendant here, did have that capacity. There is no evidence to the contrary. At a minimum, it had the capacity to import over 50 kilos, which would place defendant in the same guideline range. Therefore, a downward adjustment would be clear error.

with the co-conspirators. The evidence in the earlier trial and at sentencing of the coconspirators did not establish as an objective of the conspiracy the importation of 2,500 kilos from Columbia. The United States Attorney did not present that evidence to the first jury because he principally had only the testimony of witness Kohler. The corroborating testimony of witnesses Fleitas, Palmer and Stewart became available only after the first trial. When that evidence was developed, it should have been, and was, used against the remaining participant in the conspiracy. The fact that the government's case was more substantial against this defendant was solely a function of his having been a fugitive at the time of the first trial. That is not a valid basis for misapplying the guidelines with respect to the proper amount of cocaine to be considered at sentencing.

I would remand the case to the District Court for resentencing under the appropriate level 38 range of 235 to 293 months.